Argued September 24, affirmed November 26, 1971

# STATE OF OREGON, *Respondent, v.* THOMAS EUGENE STANTON, *Appellant.*

490 P2d 1274

*Clemens E. Ady,* Salem, argued the cause for appellant. With him on the brief were Williams, Wheeler & Ady, Salem.

*John L. Snyder,* District Attorney, Dallas, argued the cause and filed the brief for respondent.

Before Schwab, Chief Judge, and Langtry and Thornton, Judges.

SCHWAB, C. J.

Defendant appeals from a conviction of the crime of possession of marihuana. ORS 474.020. The only assignment of error is that the trial court erred in failing to grant defendant's motion to suppress substantial evidence seized from his farm.

The facts, as developed at the hearing on the motion to suppress, are as follows: On August 28 or 29, 1970, a private citizen delivered a plant to Officer Richards of the Willamina Police Department. The officer was unable to identify the plant, but left it for Chief of Police Colton with a note stating who brought it to the police department. (This note did not include any report as to where the plant had been obtained.) On August 29, Chief Colton found the plant and note; he identified the plant as marihuana, and immediately went to the home of the private citizen who had delivered it to the police.

At this point there is considerable confusion in the record. Apparently the citizen who brought the marihuana plant to the police was the father of two

boys, aged about 12 and 17. And apparently it was one or both of these boys who actually found and severed the marihuana plant in question, and then gave it to the father, who in turn gave it to the police.

The record is clear that when Chief Colton arrived at the family residence, the father was not present, and Chief Colton spoke with the younger son. But matters are again confused as to what Chief Colton was told. At one point he testified he was told that the marihuana plant came from defendant's farm, and at another point he testified he could not remember what, if anything, he was told.

It is clear that Chief Colton, at his request, was then guided by the younger son to a location on defendant's property where the Chief observed a large amount of marihuana under cultivation. Chief Colton picked one of these plants and returned to his office to apply for a search warrant.

The affidavit Chief Colton executed in support of his application for a search warrant reads:

"I, ROBERT J. COLTON, being first duly sworn, depose and say:
"* * * * *

"That, by reason of the following facts the undersigned has reasonable grounds to believe that all or part of such marijuana is presently located on the premises owned by Thomas E. Stanton and Sandra Stanton at Route 1, Box 255, Willamina, Oregon, said premises also being known as 'Green Parrot Goat Ranch.'

"That I am Chief of Police for the City of Willamina, Oregon, and on the 29th day of August, 1970, a private citizen delivered to Earl Richards of the Willamina Police Department certain plant material which Earl Richards gave to me. Earl Rich-

ards stated to me that the private citizen who delivered said plant material to him stated that he obtained said plant material on the 28th day of August, 1970, and that there were more plants of the same type growing in the fenced area from which the plant material was removed. I have personally known this private citizen for approximately 20 years and have always found him to be trustworthy and reliable. I have observed green marijuana plants on prior occassions [sic] and after examining the plant material delivered to the Willamina Police Department I identified it to be marijuana. After identifying the plant material I traveled to the home of the aforementioned private citizen and inquired where the plant material had been obtained. I was guided to the premises at the above address and the location from which said plant material was obtained was pointed out to me personally.

"* * * * * "

At the suppression hearing Chief Colton was unable to explain the discrepancies between his earlier affidavit and his testimony at that time. The affidavit refers to statements Officer Richards made to Chief Colton. But the Chief's testimony made it clear he instead received a note from Richards that evidently only included the name of the private citizen who had turned in the plant. The affidavit implies that the private citizen personally picked the plant. But the record of the suppression hearing indicates the plant was apparently picked by the sons of the private citizen. The affidavit claims the private citizen reported more of the same kind of plant was growing in the area from which the plant was removed. But all indications at the suppression hearing were that such was never said, or at least, if said, it was not the personal knowledge of the private citizen (the father). And

the affidavit omits all mention of the facts that Chief Colton personally observed a large number of marihuana plants under cultivation on defendant's farm, and that he personally picked another plant.

The defendant contends, and the state concedes, that when Chief Colton went on defendant's property he was trespassing.[1] The defendant argues that this trespass constituted an unconstitutional search under the Fourth Amendment.

We have previously noted the question of whether a prior trespass invalidates a subsequent search, but have not squarely disposed of it. *See, State v. Brown,* 1 Or App 322, 461 P2d 836 (1969), Sup Ct *review denied* (1970); *State v. Albertson,* 1 Or App 486, 462 P2d 458 (1969), Sup Ct *review denied* (1970). We find it necessary to reach that question at this time.[2]

The court concluded, and the state here argues that Chief Colton's trespass was not an unconstitu-

---

[1] Oregon courts have never ruled on the extent to which the veracity of statements in a search warrant affidavit can be attacked by way of a motion to suppress. The cases from other states concerning this problem are collected in Kipperman, *Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence,* 84 Harv L Rev 825 (1971), and Note, *Testing the Factual Basis for a Search Warrant,* 67 Colum L Rev 1529 (1967). *But see,* ORS 141.150, dealing with the procedure for "controverting" grounds for issuing a search warrant. We are here dealing not with a challenge to the veracity of the affidavit, but rather with testimony which gives the details surrounding the ultimate facts set out in the affidavit.

[2] Consideration of defendant's constitutional claim is not obviated by the fact that Chief Colton obtained a warrant to search defendant's farm *after* having committed the trespass. If, as defendant contends, Chief Colton's trespass constituted an illegal search, the subsequent search and seizure pursuant to warrant would, on this record, be the fruit of the poisonous tree and thus subject to the exclusionary rule. Wong Sun v. United States, 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963); State v. Hogg, 7 Or App 99, 490 P2d 198 (1971).

tional search under the "open-field" doctrine of *Hester v. United States*, 265 US 57, 44 S Ct 445, 68 L Ed 898 (1924). In that case the Supreme Court held that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. * * *"[6] 265 US at 59. Defendant here argues that *Hester* is no longer good law. At oral argument the state conceded there was some serious question about the validity of *Hester* and its progeny in light of later United States Supreme Court decisions.

The rationale of *Hester* was that some areas are constitutionally protected against unreasonable searches while other areas are not.[7] However, protection has never been strictly limited to "persons, houses, papers and effects." Even before the *Hester* decision, the Supreme Court had acknowledged that the protections of the Fourth Amendment extend to an office,[8] a store,[9] and the contents of a sealed letter in the mail.[10]

After the *Hester* decision, the list of constitutionally protected areas grew steadily, and was held

---

[6] Subsequent cases adhering to Hester v. United States, 265 US 57, 44 S Ct 445, 68 L Ed 898 (1924), established that the area in the immediate vicinity of the home—the curtilage—is to be treated as part of the home and accorded full protection. *See*, e.g., Care v. United States, 231 F2d 22 (10th Cir), *cert denied* 351 US 932 (1956).

[7] The phrase "constitutionally protected areas" was first used by Judge Frank, dissenting in United States v. On Lee, 193 F2d 306 (2d Cir 1951), *aff'd* 343 US 747 (1952).

[8] Gouled v. United States, 255 US 298, 41 S Ct 261, 65 L Ed 647 (1921).

[9] Amos v. United States, 255 US 313, 41 S Ct 266, 65 L Ed 654 (1921).

[10] Ex parte Jackson, 96 US 727, 24 L Ed 877 (1877).

to include, for example, a hotel room,[8] a warehouse,[9] an automobile,[10] a taxicab,[11] a garage,[12] an employe's desk in a government office,[13] a chicken house,[14] and even a garbage can.[15]

Defendant argues that the practice of automatically according constitutional protection to certain areas while automatically denying it to others is no longer viable. It is true that there has been a substantial reduction in the use of property concepts in applying Fourth Amendment principles.

"* * * We are persuaded * * * that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. * * * Distinctions such as those between 'lessee,' 'licensee,' 'invitee' and 'guest,' often only of gossamer strength, ought not to be determinative in fashioning procedures ultimately referable to constitutional safeguards." *Jones v. United States*, 362 US 257 at 266.

"* * * We have recognized that the principal

---

[8] United States v. Jeffers, 342 US 48, 72 S Ct 93, 96 L Ed 59 (1951).

[9] See v. Seattle, 387 US 541, 87 S Ct 1737, 18 L Ed 2d 943 (1967).

[10] United States v. Carroll, 290 US 694, 54 S Ct 130, 78 L Ed 597 (1925).

[11] Rios v. United States, 364 US 253, 80 S Ct 1431, 4 L Ed 2d 1688 (1960).

[12] *See,* e.g., United States v. Hayden, 140 F Supp 429 (D Md 1956).

[13] United States v. Blok, 188 F2d 1019 (DC Cir 1950).

[14] Walker v. United States, 125 F2d 395 (5th Cir 1942).

[15] People v. Edwards, 71 Cal2d 1096, 80 Cal Rptr 633, 458 P2d 713 (1969).

object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts. * * *" *Warden v. Hayden,* 387 US 294, 304, 87 S Ct 1642, 18 L Ed 2d 782 (1967).

The evolution away from the strict use of property concepts in these cases culminated in *Katz v. United States,* 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967). That case involved the admissibility of evidence obtained by way of an electronic listening and recording device attached to the outside of a public telephone booth. The Supreme Court held the evidence to have been unconstitutionally obtained, and stated:

"* * * [T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. * * * But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected * * *." 389 US at 351-52.

"It is true that this Court has occasionally described its conclusions in terms of 'constitutionally protected areas,' * * * but we have never suggested that this concept can serve as a talismanic solution to every Fourth Amendment problem." 389 US at 351, n 9.

Now under *Katz,* the inquiry must be whether the defendant had a *reasonable* expectation of privacy in the area in question. *See, generally,* Note, 43 NYU L Rev 968 (1968). Mr. Justice Harlan's concurring opinion in *Katz* is helpful in defining how this inquiry should be made:

"* * * [T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the ex-

pectation be one that society is prepared to recognize as 'reasonable'. * * *" 389 US at 361.

This can be illustrated by recent cases that have considered whether police surveillance activities in public toilet stalls amount to an illegal search. One pre-*Katz* case held a public toilet stall was not a "constitutionally protected area." *See, Smayda v. United States,* 352 F2d 251 (9th Cir 1965), *cert denied* 382 US 981 (1966). Post-*Katz* cases have, however, uniformly held such police activity to be an unconstitutional search, reasoning that: (1) a person using such a facility has a subjective expectation of privacy; and (2) that expectation is one that society is prepared to recognize as reasonable. *State v. Bryant,* 287 Minn 205, 177 NW2d 800 (1970); *Brown v. State,* 3 Md App 90, 238 A2d 147 (1968).[⑳]

We now reach the central question: In light of the *Katz* reasonable-expectation-of-privacy test, what is the current status of the *Hester* open-field rule?

We note that *Hester* was cited with approval in *Katz* by both Mr. Justice Stewart's majority opinion, 389 US at 351, n 8, and Mr. Justice Harlan's concurring opinion, 389 US at 360. However, the idea that an open field can never be protected is inconsistent with the balance of those opinions. The better analysis appears to be:

> "* * * Under *Katz,* even activities carried on in an open field might be the subject of fourth amendment protections if the parties reasonably rely on the fact that such activities will remain private. * * *" Hendricks, *Eavesdropping, Wire-*

[⑳] California courts had reached the same result before Katz v. United States, 389 US 347, 88 S Ct 507, 19 L Ed 2d 576 (1967). Bielicki v. Superior Court, 57 Cal2d 602, 21 Cal Rptr 552, 371 P2d 288 (1962); Britt v. Superior Court, 58 Cal2d 469, 24 Cal Rptr 849, 374 P2d 817 (1962).

*tapping and the Law of Search and Seizure—Some Implications of the Katz Decision,* 9 Ariz L Rev 428, 435 (1968).

Several recent cases have recognized this possibility. *See,* e.g., *Wattenberg v. United States,* 388 F2d 853 (9th Cir 1968) (alternative holding); *Commonwealth v. Robbins,* 216 Pa Sup 233, 263 A2d 761 (1970); *People v. Bradley,* 1 Cal3d 80, 81 Cal Rptr 457, 460 P2d 129 (1969).

We return to the record to determine whether the defendant had a reasonable expectation of privacy in the area where Chief of Police Colton committed the challenged trespass.[®] We review the facts in light of Mr. Justice Harlan's suggested test in *Katz.*

Although the defendant did not testify at the suppression hearing, we will assume that he had the subjective expectation that his cultivated plot of land would remain private.

█ The real problem is whether that expectation was objectively reasonable. In general, it is not possible to say that an expectation of privacy is objectively reasonable when activities are carried on in an open field. But just as "constitutionally protected areas" is no longer a talismanic phrase, *Katz,* 389 US at 351, neither should "open field" be a talismanic phrase. Instead, whether there is a reasonable expectation of privacy turns on the facts of each case.

Our consideration of this issue in the case at bar is somewhat handicapped, since few facts were

---

[®] Our decision in State v. Brown, 1 Or App 322, 461 P2d 836 (1969), Sup Ct *review denied* (1970), is consistent with this analysis. We concluded the *Brown* defendant did not have a reasonable expectation of privacy as to marihuana growing in a greenhouse directly behind his residence. *Accord*: People v. Bradley, 1 Cal3d 80, 81 Cal Rptr 457, 460 P2d 129 (1969).

developed at the suppression hearing. The only witness who testified at that time was Chief Colton. From his limited testimony we do know the cultivated plot was on undeveloped pasture land with mostly brush and small trees, and some open areas. It was not close to any roads.

Chief Colton testified that he crossed "a couple" of fences to get to the cultivated area. The Chief did not recognize any of these fences as property-line fences; one he remembered as being a corral fence.

When Chief Colton got to the cultivated area, there was another fence (not described in the record) that enclosed about 50 marihuana plants. But this last fence is of no special significance, since the Chief observed what he estimated to be 140 marihuana plants growing outside it.

It is of special significance, we believe, that evidently the plants were first discovered by two young boys who, according to the record, were searching for lost cattle. This indicates that the plants were in plain view for anybody who happened to be on the property.

In large parts of Oregon fences are designed more to keep livestock under control than to keep people out. And it is not uncommon for members of the public to engage in various recreational activities on private property. Considering these limited facts, we conclude that whatever subjective expectation of privacy the defendant had in his cultivated plot of land was not objectively reasonable under the circumstances here.

■ We recognize that while it may not be objectively reasonable for a person to expect privacy as to one class of persons or persons with one purpose, he may reasonably expect privacy as to the same or

other classes with other purposes. A person may not expect privacy in his open field or backyard as against children at play or parents looking for lost or tardy children. Yet he may subjectively expect and objectively be entitled to expect privacy as against policemen making a "dragnet" search of a whole group of private fields or a whole neighborhood of backyards in the assumption that if they search long enough and far enough they will find some evidence of some crime. Here, the defendant had no objectively reasonable right of privacy as to a substantial segment of the public. It was not reasonable for him to assume that if he maintained contraband in plain view in a semi-public area and some member of the public observed it, that person would not report it, or that if reported the police would not investigate.

Affirmed.